[819 NYS2d 10]

Maria Cubas et al., Respondents, v Raymond Martinez, Individually and as Commissioner of New York State Department of Motor Vehicles, Appellant.

First Department, July 6, 2006

**APPEARANCES OF COUNSEL**

*Eliot Spitzer, Attorney General,* New York City (*Gregory Silbert, Caitlin J. Halligan* and *Michael S. Belohlavek* of counsel), for appellant.

*Patterson, Belknap, Webb & Tyler LLP,* New York City (*Adam J. Pessin, Steven A. Zalesin* and *Christine Miller* of counsel), and *Puerto Rican Legal Defense & Education Fund,* New York City (*Foster S. Maer* and *Jackson Chin* of counsel), for respondents.

*Washington Legal Foundation,* New Hartford (*Daniel J. Popeo* of counsel) and *Washington Legal Foundation,* Washington, DC (*Richard A. Samp* of counsel), for amici curiae.

**OPINION OF THE COURT**

Tom, J.

In this putative class action, plaintiffs challenge proof of identity requirements imposed by defendant Commissioner of the Department of Motor Vehicles (DMV) for the issuance of drivers' licenses and nondriver identification cards (NDIDs). Plaintiffs contend that defendant failed to comply with the State Administrative Procedure Act in implementing the identification procedures and that the identity requirements were adopted in violation of plaintiffs' constitutional right to equal protection of the law and procedural due process. Specifically disputed is the Commissioner's authority to require that any alien claiming to be ineligible for a Social Security number (SSN) supply current documentation of proof of ineligibility from the Department of Homeland Security (DHS). Plaintiffs further assert, inter alia, that the practice of issuing suspension notices to any person whose SSN cannot be verified through Social Security Administration (SSA) records violates the right to procedural due process by failing to provide an opportunity to be heard in opposition to the proposed suspension.

Background

Every applicant for issuance or renewal of a license is required to provide a valid SSN (Vehicle and Traffic Law § 490 [3] [a] [i]; § 502 [1], [6] [a]). Pursuant to 15 NYCRR 3.9 (a) and (b), persons whom SSA finds ineligible to be issued Social Security

identification numbers may obtain or renew licenses upon providing proof of their ineligibility. The regulation states:

"(a) An applicant for a license or a non-driver identification card or an applicant renewing such a license or such identification card must submit his or her social security number or provide proof that he/she is not eligible for a social security number.

"(b) The failure of a person to submit his or her social security number or to provide proof that he/she is not eligible for a social security number . . . will disqualify such person from renewing such license or identification card or obtaining such a license or identification card."

To indicate that a person is currently ineligible, SSA issues Form SSA-L676 SSN Card Denial Notice. However, DMV procedures require submission of current supporting DHS documents that SSA examined to reach a determination of ineligibility.[1]

In 2001, SSA made an online database available to the states, access to which was afforded by a memorandum of agreement executed by DMV on September 10, 2001 and approved by the Regional Commissioner of Social Security on October 25, 2001. In addition to using the SSA database to verify numbers submitted by current applicants, DMV has instituted the "SSN Verification Project" to establish the validity of over 10 million numbers that were collected prior to the availability of the database. This project was accelerated after an interim audit disclosed "thousands of Social Security numbers being used by multiple individuals, including one case where 57 individuals shared a single Social Security number" (remarks of Commr of Motor Vehs to Assembly Transp Comm, Aug. 19, 2004). Illustrative of the abuses that were facilitated by less stringent identification requirements, the audit identified one person who had committed over $100,000 in bank fraud by employing 15 different licenses with different names and dates of birth; hundreds of New York City taxi drivers who used one license for registration and insurance purposes and another to present to police when stopped for traffic infractions; and an individual who held six licenses and was selling fake identification packages and using the fictitious identities to stage accidents, from

---

1. According to the record, DHS Forms I-94, I-94W, I-95A, I-184, I-485 and I-797 were used by SSA in determining an applicant's eligibility.

which he obtained over $100,000 in the payment of fraudulent claims (*id.*).

In connection with the effort to deter the misuse of driver's licenses and NDIDs (collectively, licenses), DMV has also instituted the "Temporary Visitors Program," governing the initial licensing of nonimmigrant foreign nationals. Under guidelines established by DMV, only applicants who are authorized to remain in the country for more than one year and for whom at least six months remain in the authorized visitation period are generally eligible for licensing (the one year/six month guideline). Any license issued under the program expires at the end of the authorized visitation period, the date of which is prominently marked on the license.[2] DMV's operating procedures permit a supervisor to depart from these guidelines where an applicant has a valid reason for obtaining a driver's license.

The Action

Plaintiffs are three named persons and six individuals who are suing as John Does because they fear retaliation and harassment as a result of their immigration status. All are aliens who have resided in the City of New York for an extended period of time (5 to 20 years). At least five of the nine have not satisfied the requirements for obtaining lawful resident alien status and, thus, fall into the category of residents commonly denominated as illegal aliens or undocumented aliens. Plaintiff Maria Cubas is a Honduran national with temporary protected status (8 USC § 1254a), a classification that, according to the Commissioner's brief, has been extended until July 5, 2006. Plaintiff Eris Lumi is a derivative asylee (8 CFR part 208) from Albania, whose classification is based on his father's asylum petition. Plaintiff Robert McIntyre's immigration status is not stated in the complaint but is questionable; the SSN he submitted in connection with the renewal of his driver's license could not be matched with information contained in SSA records, resulting in the loss of his driving privileges.

Plaintiffs commenced the instant action by the filing of a summons and complaint dated August 26, 2004, superseded by an amended verified complaint dated January 14, 2005. The complaint asserts that the need to submit DHS documentation

---

**2.** Pursuant to the Real ID Act of 2005 (Pub L 109-13, division B, tit II, §§ 201-207 [May 11, 2005]), expiration of a state driver's license must coincide with the expiration date of an alien's legal status documents and such date must be clearly indicated (*id.* § 202 [c] [2] [C] [ii], [iii]).

to establish ineligibility for an SSN and to demonstrate a minimum period of residency under the Temporary Visitors Program effectively imposes a "legal presence requirement" not authorized by law in order to qualify for a license or NDID. In February 2005, plaintiffs moved for a temporary restraining order to enjoin "the issuance or mailing of suspension letters pursuant to the Social Security Number Verification Program" and "any denials, suspensions or other deprivations of licenses or cards based upon the legal presence requirement." In support of their application for a preliminary injunction, plaintiffs alleged that the SSN Verification Project and the legal presence requirements imposed by the Commissioner exceed his statutory authority and, variously, violate the State Administrative Procedure Act, the Equal Protection clauses of the United States and New York State constitutions and plaintiffs' right to procedural due process. They further asserted that the SSN Verification Project violates procedural due process because the letter DMV mails to any person with an unverified SSN fails to state that the recipient has an opportunity to contest the impending license suspension.

Supreme Court agreed, issuing an order that preliminarily enjoined the Commissioner from (1) requiring an applicant for a driver's license or NDID to provide documentation that is unavailable to an undocumented alien; (2) maintaining an administrative policy under which temporary visitors to the United States are generally denied driver's licenses or NDIDs either if they were originally authorized to remain in the United States for less than a year or if they are presently authorized to remain for less than six months (one year/six month guideline); and (3) taking any further action with respect to any person who fails to respond to a notice that the SSN on file with DMV does not match the number assigned by SSA, without first providing additional notice that proof of ineligibility for an SSN may be provided in lieu of a valid number. The order further denied the Commissioner's cross motion to dismiss the complaint. The motion court's preliminary injunction has been stayed during the pendency of this appeal (CPLR 5519 [a] [1]).

On appeal, the Commissioner argues that the complaint is without merit and should be dismissed. At a minimum, he asserts that plaintiffs have not established the necessary criteria for injunctive relief, having failed to demonstrate a probability of ultimate success on the merits, irreparable injury in the event that injunctive relief is denied and a balancing of the equities

(*W.T. Grant Co. v Srogi*, 52 NY2d 496, 517 [1981]; *see also Aetna Ins. Co. v Capasso*, 75 NY2d 860, 862 [1990]).

This Court finds that the identity procedures implemented by Commissioner Martinez are authorized by state and federal statutes and further a legitimate state interest, that the putative class does not represent a protected class for the purposes of equal protection and that plaintiffs' due process challenge to the issuance of suspension notices is not ripe. Thus, we conclude that plaintiffs have no chance of succeeding on the merits of their claims and that Supreme Court erred in granting the preliminary injunction and denying the Commissioner's cross motion to dismiss the complaint.

Due Process

Plaintiffs contend that the SSN Verification Project violates their right to due process. They seek to enjoin DMV from mailing license suspension notices unless DMV provides the recipient with the grounds for the proposed suspension, notice that ineligibility for an SSN is an acceptable alternative to providing a number and an appropriate opportunity to challenge the proposed suspension.

The SSN Verification Project identified approximately 600,000 DMV records containing information that did not match the data reflected in the comparable federal record, meaning that either the SSN contained in the DMV record was invalid or the SSN identification information (name and date of birth) was inconsistent with the federal record. In such cases, the affected licensee was informed, by letter, that DMV had "not been able to verify with the Social Security Administration the social security number you provided when you applied for your learner permit, driver license or nondriver ID card. As a result, we will not be able to process any transactions relating to these documents until this issue is resolved." The letter requested that the individual contact DMV within 15 days either by telephone or through the DMV Web site to correct the record. It further stated, "Please be advised that if you do not contact us *within 15 days* from the date of this letter, we will have to take additional action, including the possible suspension of your learner permit, driver license or identification document."

Approximately 58% of the 600,000 individuals who received the letter have since verified their SSNs or their ineligibility for an SSN. DMV has not yet suspended the licenses of any noncommercial drivers failing to respond to the letter. However, DMV has suspended the licenses of some 1,700 noncommercial driv-

ers in cases where the licensee was fraudulently using multiple SSNs or where a number of licensees were found to be using a single SSN. Additionally, the licenses of approximately 6,000 commercial drivers were suspended because they lacked an SSN and, after receiving individual notice, were unable to present the requisite proof.[3]

■ Plaintiffs' due process claim is barred by the doctrine of ripeness. It is uncontested that no plaintiff's license or NDID has been suspended under the SSN Verification Project, and such a suspension may never occur. "Where the harm sought to be enjoined is contingent upon events which may not come to pass, the claim to enjoin the purported hazard is nonjusticiable as wholly speculative and abstract" (*Matter of New York State Inspection, Sec. & Law Enforcement Empls., Dist. Council 82, AFSCME, AFL-CIO v Cuomo*, 64 NY2d 233, 240 [1984]). Thus, plaintiffs' due process claim must be dismissed.

We note that DMV's practice of withholding a renewal license for failure to supply an SSN without conducting a hearing has been found to comport with due process. In *Stoianoff v Commissioner of Motor Vehs.* (107 F Supp 2d 439, 448 [SD NY 2000], *affd* 12 Fed Appx 33 [2001]), the court held, "States are free to amend vehicle and traffic laws to impose preconditions to license renewals . . . without running afoul of the due process clause." The court stated that the Legislature's incorporation into the Vehicle and Traffic Law of a provision requiring an SSN to be submitted upon the renewal of a license affords the necessary due process to the applicant (*id.*, citing *Bi-Metallic Investment Co. v State Bd. of Equalization of Colo.*, 239 US 441, 445-446 [1915]). Moreover, the Social Security Act's express authorization for the use of SSNs for identification purposes in connection with the administration of state drivers' licensing laws (42 USC § 405 [c] [2] [C] [i]) reflects congressional recognition of New York's powerful, legitimate interest in the administration of its comprehensive regulatory scheme (*Stoianoff*, 107 F Supp 2d at 448). Finally, due process does not mandate a hearing unless disputed issues of fact require resolution (*id.* at 449). On its face, the Vehicle and Traffic Law requires submission of an SSN to qualify for license renewal; only where the licensee offers an excuse for the failure to provide a valid SSN in response to the

---

3. These suspensions are not challenged by plaintiffs since federal law mandates that SSNs be supplied for commercial licensing (*see* 49 CFR 383.153).

notice of suspension is any issue of fact raised that might warrant a hearing.[4]

## Ultra Vires

Plaintiffs' contention that the Commissioner has acted in excess of his powers is directed at his implementation of 15 NYCRR 3.9, which makes licenses available to persons who are unable to obtain an SSN because, though lawfully present in the United States, they lack work authorization (*e.g. Majlinger v Cassino Contr. Corp.*, 25 AD3d 14, 16 [2005] [tourist visa], *affd* 6 NY3d 338 [2006]). In lieu of an SSN, this provision permits an applicant to "provide proof that he/she is not eligible for a social security number" (15 NYCRR 3.9 [a]). At issue is the administrative requirement that an applicant supply not only a letter from SSA stating that the applicant is ineligible to receive an SSN (Form SSA-L676 SSN Card Denial Notice) but also the supporting immigration document (DHS Form I 94 or equivalent DHS documentation) on which the SSA based its determination. Plaintiffs contend that this identification requirement exceeds the Commissioner's authority and violates the State Administrative Procedure Act because it effectively restricts the issuance of licenses to persons who are legally present in the United States, whereas the Vehicle and Traffic Law contains no requirement that an applicant establish legal presence in order to receive a license (citing *Villegas v Silverman*, 832 NE2d 598 [Ind App 2005]). Plaintiffs argue that 15 NYCRR 3.9 only requires an applicant to "provide proof that he/she is not eligible for a social security number," that the SSA-L676 ineligibility letter constitutes such proof and that DMV has no right to make any further inquiry, particularly where it requires the disclosure of the applicant's immigration status.

For the purpose of deciding whether the Commissioner has acted ultra vires or in violation of the State Administrative Procedure Act, the question to be decided is whether the powers afforded to the Commissioner under the Vehicle and Traffic Law permit him to adopt the challenged procedures, which were implemented pursuant to a statutory mandate to ascertain the identity of every applicant for a driver's license (Vehicle and

---

4. Vehicle and Traffic Law § 510 (3-a) mandates an opportunity to be heard only when suspension is "permissive." The requirement to furnish an SSN is a precondition to the grant of a license and not a listed ground for permissive suspension (*see* Vehicle and Traffic Law § 510 [3]). In any event, because no plaintiff has been subjected to a license suspension, no challenge to the grounds for suspension has been asserted; thus, no issue of fact requiring a hearing has been raised.

Traffic Law § 502 [1], [6] [a]) or NDID (Vehicle and Traffic Law § 490 [3] [a] [i]). As plaintiffs concede, the Commissioner is vested with broad authority to designate acceptable proof of "identity, age, and fitness" (Vehicle and Traffic Law § 502 [1]), and his discretion to specify the materials to be submitted with an application extends to "all information required by statute and such other information as the commissioner shall deem appropriate" (Vehicle and Traffic Law § 508 [2]). Particularly with respect to the issuance of NDIDs, the statute provides that the Commissioner must be "satisfied that the person described is the applicant" (Vehicle and Traffic Law § 490 [3] [a] [i]).

The Commissioner's authority to regulate the issuance of NDIDs and driver's licenses is derived from Vehicle and Traffic Law §§ 490 and 502. Vehicle and Traffic Law § 502, entitled "Requirements for licensing," provides, in pertinent part:

> "The applicant shall furnish such proof of identity, age, and fitness as may be required by the commissioner. The commissioner may also provide that the application procedure shall include the taking of a photo image or images of the applicant in accordance with rules and regulations prescribed by the commissioner. In addition, the commissioner also shall require that the applicant provide his or her social security number" (§ 502 [1]).

The statute, in addition to the requiring an applicant to furnish "such other information as the commissioner shall deem appropriate" (Vehicle and Traffic Law § 508 [2]), confers upon the Commissioner express authority to "promulgate regulations with respect to the administration of the provisions of [the statute]" (Vehicle and Traffic Law § 508 [4]), to delegate authority regarding the acceptance and issuance of licenses and to "prescribe the internal procedures to be followed by such agents with respect to such matters" (Vehicle and Traffic Law § 508 [1]).

The broad discretionary powers granted to the Commissioner by the Legislature obviate the need to resort to the State Administrative Procedure Act to implement internal administrative procedures, such as the designation of documents acceptable to prove ineligibility for an SSN (*cf. Boreali v Axelrod*, 71 NY2d 1, 11-14 [1987] [no-smoking regulations exceeded scope of administrative rulemaking]). Such a policy or guideline is not usually considered a rule that must be formally promulgated pursuant to the State Administrative Procedure Act, which ap-

plies only to "a fixed, general principle to be applied by an administrative agency without regard to other facts and circumstances relevant to the regulatory scheme of the statute it administers" (*Matter of New York City Tr. Auth. v New York State Dept. of Labor*, 88 NY2d 225, 229 [1996]). As a general principle, the agency that administers a statute is accorded considerable discretion in formulating operational procedures to carry out the intention of the Legislature, particularly with respect to matters not explicitly provided for (*Kurcsics v Merchants Mut. Ins. Co.*, 49 NY2d 451, 459 [1980]; *see also Matter of Dworman v New York State Div. of Hous. & Community Renewal*, 94 NY2d 359, 371 [1999]). Here, the statute provides for submission of an SSN, but it is silent as to the necessary documentation to be obtained from a person who has not been issued a Social Security identification number. The Commissioner's construction of his statutory mandate to include supporting DHS documentation together with the SSA-L676 notice as acceptable proof of identity is a reasonable exercise of his administrative discretion.

Plaintiffs contend that they have been adversely impacted by the requirement to submit DHS documentation to DMV. Affidavits included in the record from John Does VII, VIII, and IX indicate that they are not eligible to receive an SSN and are afraid of retaliation from DMV and DHS if their identities are revealed. Two of the affidavits assert economic disadvantage resulting from the inability to operate a motor vehicle, whether as a condition of employment or as a means to commute to a place of employment, and the third asserts inconvenience. Plaintiffs contend that the Commissioner has improperly imposed a "legal presence requirement" by mandating either the submission of an SSN, which SSA will generally refuse to issue to someone without work authorization (*see e.g. United States v Ndiaye*, 434 F3d 1270, 1278 [2006]), or the SSA-L676 ineligibility letter together with the supporting DHS documentation indicating the reason for SSN ineligibility. Plaintiffs argue that the statute only authorizes DMV to require proof of "identity, age, and fitness as may be required by the commissioner" (Vehicle and Traffic Law § 502 [1]). Thus, they assert, once an applicant has submitted a letter of ineligibility from SSA, the Commissioner has no authority to require the applicant to submit the supporting DHS documentation used by the federal agency in reaching a determination of ineligibility. Assessment of this contention requires examination of the

administrative purpose served by DMV's use of SSNs and the reliability of the various documents that might be submitted to the agency by an alien to prove age and identity.

According to the Commissioner, an SSN has been required from commercial driver's license applicants since 1991, from all driver's license applicants since 1995 (L 1995, ch 81, § 209) and from NDID applicants since 2002 (L 2002, ch 235, § 1). As DMV's memorandum in support of the recent amendment makes clear, the purpose of requiring an SSN from an applicant is to prevent fraud:

> "Social security numbers . . . provide an additional element of verification to the identification process, enabling the Department of Motor Vehicles to verify that the applicant is, in fact, who s/he purports to be. This enhances the security of those documents, not only for driver licensing purposes, but also in recognition of the fact that the driver license is relied upon by the commercial and law enforcement communities as both a source of identification, and as a 'breeder document' used to obtain other proofs of identity, establish credit, demonstrate eligibility for entitlements and other services, etc." (Dept of Motor Vehs Mem in Support of L 2002, ch 235, 2002 NY Legis Ann, at 140.)

Effectiveness of the statutory scheme for regulating licensed drivers depends upon DMV's capacity to ascertain that a particular person has obtained the necessary qualifications to operate a motor vehicle (Vehicle and Traffic Law § 502 [1]) and that, once licensed, an individual has exercised the privilege of driving without committing infractions that warrant its suspension (*see* Vehicle and Traffic Law § 510). The ability to establish who is in control of a vehicle and, thus, chargeable with a particular infraction presumes that the operator's identity can be conclusively established by the driver's license issued by DMV, which the operator is required to produce upon request (Vehicle and Traffic Law § 401 [4]). It is the general acceptance of the driver's license as proof of identity, and its official recognition as such (*see e.g.* Civil Service Department Regulations [4 NYCRR] § 60.4 [f]; § 81.4 [f]; Election Law § 8-302 [2-a] [a] [i]; Public Health Law § 4174 [8]), that prompted legislation permitting an NDID to be issued to any person not qualified to drive (Vehicle and Traffic Law § 490). Rigorous validation of identity is warranted to ensure the integrity of licenses, both to ef-

fectively regulate operators of a motor vehicle and to deter identity fraud.

At the federal level, it is the identification number assigned by SSA that uniquely identifies an individual. For instance, the number is used by the Internal Revenue Service as a taxpayer identification number. The SSN, like the driver's license, is widely utilized for commercial purposes such as identifying employees, tracking income and affiliating financial resources and obligations. Lacking a photograph, however, the Social Security card is considerably less useful as a means of personal identification.

The immediate benefit of obtaining an SSN from every license applicant is that it permits DMV to associate each license with one, and only one, licensee. The use of SSNs to uniquely identify the licensee prevents such fraudulent activities as the use of a single SSN to obtain licenses for 57 different persons and the use of two SSNs to obtain two licenses for a taxicab driver, one of which is used to register and insure the vehicle and the other to accrue traffic infractions issued against the operator.

In opposition to plaintiffs' application, the Commissioner asserts that proof of SSN ineligibility is critical because, in its absence, individuals who already have SSNs could secure false identification documents under false names and/or dates of birth. The Commissioner states, "Neither foreign-source documents nor expired DHS documents are useful for this purpose." DMV cannot verify foreign-source documents, while DHS documents can be verified by using an on-line database. The Commissioner adds that aliens who were originally ineligible for an SSN may later become eligible. Accordingly, only current DHS documents can conclusively establish that an applicant is presently ineligible to be issued an SSN. The Commissioner noted that DMV has not accepted foreign proofs of identity, including passports, since 1995 due to the sheer number and types of records involved and the inability of DMV personnel to accurately authenticate each and every such document. He stated that DMV's

> "staff cannot be trained to recognize or validate the thousands of different kinds of documents relating to identity coming from hundreds of foreign countries in foreign languages, such as passports, birth certificates, or marriage certificates. Nor does DMV have the means to check such documents with the government or jurisdiction by which they were purportedly issued."

Plaintiffs do not take issue with the reasonableness of DMV's procedures. Instead, they level the accusation that "DMV monitors and manipulates its documentation requirements for the express purpose of ensuring that . . . undocumented aliens *cannot* obtain a license or ID." They contend that, pursuant to statute, the Commissioner is obligated to issue a license merely upon being presented with proof of "identity, age, and fitness" (Vehicle and Traffic Law § 502 [1]).

Plaintiffs' argument overlooks the Commissioner's broad discretion to determine what constitutes proof of identity and what procedures are necessary to avoid identity fraud. As noted, the SSN is used to uniquely match an individual to an existing DMV record and its associated license. It is clearly against the State's interest to permit an applicant to avoid being matched with a DMV record by resorting to the simple expedient of maintaining ineligibility for an SSN, thus thwarting any attempted comparison.

Plaintiffs' contention that there is no need for any further explanation once an applicant has submitted an SSA-L676 denial letter is unavailing. The denial letter does not necessarily indicate that the applicant will ultimately be found ineligible for an SSN, but may merely reflect a determination that the proffered proof is not yet sufficient to allow the agency to assign an identification number. Furthermore, the SSA-L676 denial is usually just a photocopied form letter, easily reproduced or forged. Thus, DMV has good reason to require a license applicant to submit the supporting DHS documentation (Form I-94 or equivalent) on which SSA based its determination of ineligibility. DMV requires that "[t]he I-94 must have been issued for at least one year, and must have at least 6 months of legal status remaining." It is solely because DMV requires the submission of current DHS documentation that plaintiffs charge the Commissioner with erecting a "legal presence requirement" not contemplated by the Vehicle and Traffic Law.

It is plaintiffs' position that the statute must be administered so as to avoid a disproportionate adverse impact on undocumented aliens; however, plaintiffs have identified no provision suggesting that such special consideration is warranted. While the Vehicle and Traffic Law does not explicitly forbid the issuance of a license to an undocumented alien, neither does the statute require it. Furthermore, while plaintiffs advance the inability to obtain a driver's license as their central complaint, it should be noted that few foreign nationals visiting New York

State will have a need to apply for driver's license. Any person holding a foreign driver's license may operate a motor vehicle without obtaining a New York State license, and the Commissioner is expressly authorized to refuse to issue a license to such person (Vehicle and Traffic Law §§ 250, 502 [5] [a] [i]). Thus, the DHS documentation required under DMV's Temporary Visitors Program is relevant to the exercise of the Commissioner's statutory powers as well as his obligation to ensure the identity of license applicants.

It is reasonable to require applicants for a state document used as a means of identification to provide proofs of identity issued by an agency of the United States. The alternative would require DMV personnel to become sufficiently familiar with thousands of foreign passports, birth certificates, marriage licenses, military discharge papers, maritime identification cards and other documents in order to ascertain the legitimacy of the proffered proofs of identity, a daunting and impractical exercise. The Commissioner's resort to documents that are easily verified using an available database is a rational measure that both promotes greater efficiency in the investigation of an applicant's identity and affords increased confidence in the result.

This Court concludes that the procedures instituted by the Commissioner fulfill his statutory mandate to obtain reliable proof of identity and eligibility before issuing a license. That the documentation requirements have a disproportionate adverse impact on those who, by definition, do not possess the requisite documentation does not render the Commissioner's identification procedures ultra vires. Thus, this Court finds no merit to plaintiffs' claim that the Commissioner exceeded the scope of his statutory authority.

The difficulty of pursuing employment due to the inability of an undocumented alien to obtain a driver's license, as asserted by John Does VII and VIII, does not establish irreparable injury; "conclusory allegations of plaintiffs with respect to irreparable injury are insufficient to support [their] motion for a preliminary injunction" (*Falls St. Leasing Corp. v City of Niagara Falls*, 295 AD2d 1005, 1006 [2002] [internal quotation marks and citations omitted]; *see also Wellbilt Equip. Corp. v Red Eye Grill*, 308 AD2d 411, 412 [2003]). Nor do such allegations weigh equitably in favor of plaintiffs. By requesting preliminary relief, plaintiffs have enlisted the aid of the courts to enable the undocumented members of the putative class to obtain, by way of preliminary relief, that which they are denied by law (*see Koob v*

*IDS Fin. Servs.*, 213 AD2d 26, 32 [1995] [improper use of injunction to afford relief unavailable under CPLR 7503 (a)]). In support of the continuation of the injunction, plaintiffs intimate that this Court should invalidate the Commissioner's identification procedures so that identification documents can be provided to those who lack legal authorization to remain in the United States or to hold employment. It is not a permissible judicial function to assist a party to circumvent the law, particularly when intervention is sought under the guise of equitable relief (*see Amarant v D'Antonio*, 197 AD2d 432, 434 [1993] [applying "clean hands" doctrine]).

Plaintiffs also dispute the Commissioner's authority to implement the so-called "one year/six months guideline," which requires the relatively few persons who seek to obtain their first driver's license from New York State to supply proof of admission to the United States for a period in excess of one year with at least six months remaining in the authorized visitation period. The justification offered by the Commissioner is that the initial licensing process takes the average applicant more than six months to complete, and often takes longer than a year.[5] Drawing on his discretion to implement reasonable administrative procedures (Vehicle and Traffic Law § 508 [1]), the Commissioner explains that the guideline conserves DMV resources by withholding driver's licenses from "individuals who may have little or no opportunity to use them" while allowing a supervisor to depart from the guideline where a legitimate need to obtain a driver's license is shown. Thus, the guideline has a basis in administrative convenience.

The relative merits of the parties' contentions notwithstanding, plaintiffs have failed to identify any member of the putative class who is barred by the one year/six month guideline from obtaining a driver's license. Plaintiff Eris Lumi is a derivative asylee, not a temporary visitor and, thus, not subject to the program. The denial of a driving test to plaintiff Lumi appears to have been an administrative error. The Commissioner's brief indicates that he "currently holds a valid New York State driver's license" and plaintiffs do not dispute the allegation.

Likewise, Maria Cubas, whose application for a learner's permit was denied because her employment authorization

---

**5.** Younger drivers are required to operate a vehicle under a learner's permit for six months before obtaining a license (*see* Vehicle and Traffic Law § 501-b [1] [d]), and a new license is merely probationary for the first six months (Vehicle and Traffic Law § 501 [4]).

document indicated she had two days less than the requisite six months' remaining authorization, is asserted to have been eligible for renewal of employment authorization "sometime after January 2005." As a Honduran, her temporary protected status was extended until July 5, 2006 with automatic extension of work authorization until that date (DHS Extension of the Designation of Temporary Protected Status for Honduras, 69 Fed Reg 64084 [Nov. 3, 2004]). Thus, rejection of her application is also attributable to administrative error since she was clearly eligible for licensing under the one year/six month guideline. Because plaintiffs have failed to demonstrate that irreparable injury will accrue to any member of the putative class as a result of the Commissioner's temporary visitors initiative, an essential element for the grant of injunctive relief is absent.

It is apparent that in promulgating the challenged procedures with respect to proof of identity, the Commissioner was well within the permissible exercise of the discretion accorded by the Vehicle and Traffic Law. In view of the breadth of that discretion, the Commissioner was not required to promulgate formal rules to implement the identification requirements, and no violation of the State Administrative Procedure Act has been demonstrated. Additionally, the equities predominate in favor of the Commissioner, whose staff would otherwise be required to engage in a needless duplication of effort by acquiring the expertise necessary to authenticate a wide variety of foreign documents, expertise already possessed by DHS personnel. The Commissioner's own administrative need to assure accurate identification to prevent fraud and the related national security concerns raised by the misuse of identities outweigh any inconvenience that might accrue to plaintiffs.[6]

---

**6.** At the time Supreme Court issued its injunctive order, the Real ID Act of 2005 took effect (Pub L 109-13, division B, tit II [May 11, 2005]). The act amended the National Driver Register (49 USC § 30301 Note) to provide minimum standards for the issuance of a driver's license or NDID. Section 202 (c) (1) (C) of the act requires "[p]roof of the person's social security account number or verification that the person is not eligible for a social security account number." Section 202 (c) (2) (B) requires evidence of "lawful status," requiring "valid documentary evidence" from the applicant to establish lawful presence in the United States. Section 202 (c) (2) (C) (ii) restricts the validity of temporary licenses to the period of the applicant's "authorized stay" or one year if no period is specified. Finally, section 202 (c) (3) (B) precludes the State from accepting, as proof of age, identity or authorized presence, "any foreign document, other than an official passport."

Equal Protection

    ■ Plaintiffs' contention that the denial of licenses to undocumented aliens as the result of the SSN Verification Project violates their right to equal protection of the law is devoid of merit (*cf. Matter of Aliessa v Novello*, 96 NY2d 418, 430 [2001]). Plaintiffs point to no authority for their proposition that an undocumented alien has a fundamental right to a license that cannot be compromised by the state, even to promote a legitimate governmental interest.

    In *Plyler v Doe* (457 US 202 [1982]), on which plaintiffs rely, the Supreme Court struck a Texas law denying free public education to children of undocumented aliens. In *Plyler*, the Court required the state to demonstrate more than a legitimate interest in the challenged statute. However, the Court seems to have reasoned that somewhat stricter scrutiny was required because the children of undocumented aliens lack any control over their illegal entry into the United States (*id.* at 226). Here, plaintiffs are all adults. Thus, *United States v Toner* (728 F2d 115, 128 [2d Cir 1984]), which upheld a federal law prohibiting undocumented aliens from possessing firearms, is more to the point. There, the Court noted that the right to possess firearms is not fundamental; nor are illegal aliens a protected class so as to require the government to establish anything more than a rational basis for enacting the statute.

    It should be emphasized that the distinction plaintiffs herein have identified is not between aliens and nonaliens, it is between documented and undocumented aliens, and the notion that "illegal aliens" comprise a "suspect class" for equal protection purposes has been expressly rejected (*Plyler*, 457 US at 219 n 19; *Toner*, 728 F2d at 128). Since the subclass of undocumented aliens does not represent a suspect class, the distinction is subject only to a rational basis test (*e.g. Toner*, 728 F2d at 128-129), not strict scrutiny. Because the successful regulation of motor vehicle operators and the assurance of the integrity of identification documents are important governmental interests advanced by the Vehicle and Traffic Law, the challenged identification procedures are rationally related to the performance of the Commissioner's statutory mandate and do not offend the Equal Protection Clause (*see Sanchez v State*, 692 NW2d 812 [Iowa 2005]; *John Doe No. 1 v Georgia Dept. of Pub. Safety*, 147 F Supp 2d 1369 [ND Ga 2001]).

    Plaintiffs' equal protection challenge to the Commissioner's Temporary Visitors Program is similarly unavailing. The one

year/six month guideline does not distinguish between aliens and nonaliens; rather, it distinguishes between those aliens who are authorized to remain in the United States beyond the guideline's minimum time periods and those who are not. Likewise, it does not distinguish among individuals on the basis of a protected classification.

The identification procedures implemented by the Commissioner serve a vital governmental purpose in preventing the abuse of identification documents to commit acts of fraud or, as tragically illustrated by the events of September 11, 2001, acts of terrorism. The limitations that plaintiffs would impose on the ability to identify an undocumented alien who is working to promote his family's financial security would also hinder the detection of an undocumented alien who is working to advance the destructive ends of a terrorist organization. Plaintiffs offer no alternative to the identification procedures established by the Commissioner that would enable DMV to meet the goal of protecting the general public while simultaneously accommodating aliens who are living and working in the United States without appropriate DHS authorization.

This Court is not unsympathetic to the predicament of the otherwise law-abiding undocumented foreign national who faces difficulty in pursuing employment, commuting to a place of employment or elsewhere, or obtaining financial or other services because of the inability to obtain a driver's license or comparable form of identification. However, the objective of "the Department of Motor Vehicles to verify that the applicant is, in fact, who s/he purports to be" (Dept of Motor Vehs Mem in Support of L 2002, ch 235, 2002 NY Legis Ann, at 140) supersedes the interest of certain of the individual plaintiffs in avoiding the inconvenience associated with their undocumented status. As noted by one court, the difficulty plaintiffs have experienced in obtaining a license are attributable to their alien status and the requirements of the Real ID Act of 2005 (including attendant state legislation), not to any action on the part of the agency (*see Liberty Fund, Inc. v Chao*, 394 F Supp 2d 105, 119 n 15 [DC 2005]). Plaintiffs' remedy, if any, lies with Congress, which alone has the power to set immigration policy, to institute a guest worker program or to grant amnesty.

Accordingly, the judgment of the Supreme Court, New York County (Karen S. Smith, J.), entered on or about May 12, 2005, which preliminarily enjoined defendant Commissioner of Motor Vehicles from (1) requiring any applicant for a driver's license

or NDID to provide documentation not available to an undocumented alien; (2) maintaining a guideline under which temporary visitors to the United States are generally denied a driver's license or NDID unless originally authorized to remain in the United States for at least a year and with at least six months remaining in the authorized period; and (3) taking any further action against any person not responding to a DMV letter advising that the Social Security identification number on file does not match SSA records without additional notice that proof of ineligibility may be provided in lieu of a valid SSN; and which denied the Commissioner's cross motion to dismiss the complaint for failure to state a cause of action, should be reversed, on the law, without costs, the cross motion granted, the preliminary injunction vacated, the identity procedures employed by the Commissioner declared to be within his authority and enforceable, and the complaint otherwise dismissed.

Motion seeking leave to file amici curiae brief granted.

BUCKLEY, P.J., MAZZARELLI, MARLOW and CATTERSON, JJ., concur.

Judgment, Supreme Court, New York County, entered on or about May 12, 2005, reversed, on the law, without costs, the cross motion granted, the preliminary injunction vacated, the identity procedures employed by the Commissioner declared to be within his authority and enforceable, and the complaint otherwise dismissed. Motion seeking leave to file amici curiae brief granted.